1823.<br>WILSON<br>v.<br>TROUP.

Motion granted.

---

### WILSON and others *against* TROUP and others.

A power to mortgage, includes a power to execute a mortgage containing a power to the mortgagee to sell the premises, in default of payment; it being one of the usual and lawful remedies given to the mortgagee, known to the law, and regulated by statute.

A sale or lease of part of the premises, by a mortgagee, before foreclosure, does not prejudice or affect the right of redemption of the mortgagor; nor does it deprive the mortgagee of the right of foreclosure.

THE bill, which was filed by the children and heirs at law of *William Wilson*, deceased, stated, that *W. Wilson*, some time previous to the 6th of *October*, 1796, contracted with *Charles Williamson* for the purchase of 6000 acres of land; that *W. W.*, on the 6th of *October*, 1796, executed a power of attorney to *Daniel Faulkner*, for and in the

Nov 23, 1822,<br>and<br>Jan. 21, 1823.

name of *W. W.*, to ask, demand and receive of *C. W.*, deeds for the 6000 acres of land, (describing it,) and " to sign, seal, deliver and acknowledge, a mortgage or mortgages of the before mentioned 6000 acres, to the said *C. W.*, and bonds, to the amount of the consideration money remaining due, and payable by him, to the said *C. W.*, according to an agreement between them," &c. He, thereby, giving and granting to his said attorney, his " full power and authority to do and perform all things necessary and lawful, to the obtaining to him and to his use, the title to the said 6000 acres of land, and securing the consideration money therefor to the said *C. W.*," &c. That on the 21st of *October*, 1796, *C. W.*, by indenture, for and in consideration of 795 pounds, granted and conveyed to *W. W.* and his heirs, the undivided fourth part of the north-west quarter of township No. 6, containing 6000 acres, &c. excepting 700 acres before granted to other persons. On the same day, *F.*, in the name of *W. W.*, executed a bond and mortgage to *C. W.*, for the sum of 1115 pounds, payable on or before the 19th of *June*, 1800. The mortgage was in the usual form, with a power of sale, and was registered in the Clerk's office of *Steuben* county, *October* 27th, 1796. The bill alleged, that *F.* exceeded his power, in giving the bond referred to in this mortgage, for a greater sum than the consideration money of the premises conveyed to *W.*; and in inserting in the mortgage a power of sale. The bill stated the assignment of the bond and mortgage by *C. W.* to Sir *William Pulteney*, his death, the descent to Lady *Bath*, her death, and the descent to Sir *John L. Johnstone*; and that letters of administration on the estate of Sir *W. P.*, in this state, were granted to *Robert Troup*. That *Troup*, by virtue of letters of attorney from Sir *W. P.*, and from the heirs of Sir *W. P.*, after his death, sold and conveyed parcels of the mortgaged premises, in fee. And, that *John Fellows*, who was afterwards appointed by Sir *J. L. Johnstone* and

his wife, their attorney, in the place of *T.*, sold and conveyed parcels of the mortgaged premises, in fee. That *T.*, as the administrator of Sir *W. P.*, advertised the mortgaged premises for sale at public auction, under the power of sale inserted in the mortgage; and they were accordingly sold, in *April*, 1811, to *Samuel Haight*, the highest bidder, for 350 pounds. That *Haight* became the purchaser at the request of *T.*, who, on the 1st of *October*, 1811, by *J. F.*, as his attorney, conveyed the premises, by deed in fee, to *Haight*, who, on the day following, for the consideration of one dollar, conveyed the same to Sir *John L. Johnstone.* The bill charged, that the sale was unauthorized by law, as the power of sale was inserted in the mortgage without any authority from *W.*, and without his knowledge. The bill alleged, that *W.* had no notice whatever of the sale. That in 1812, a short time before his death, *W.*, having heard that the premises were intended to be sold, went to *Bath*, in *Steuben* county, for the purpose of preventing a sale, when he learned, for the first time, that the premises had been sold. That in 1812, or the beginning of 1813, *S. Duncan*, as agent of *W.*, inquired of *T.* whether he would receive the money due on the mortgage; or, if he declined, whether he would be satisfied with a tender of the money in bank bills, to save the expense and trouble of procuring specie; and that *T.* replied, in substance, that the claim of *W.* was unjust, and he would have nothing to do with it. The bill further alleged, that the proceedings for procuring the sale at auction, were irregular, and that no sufficient advertisement was published in *Steuben*, or any other county. That *C. W.*, after the execution of the mortgage, and before the death of Sir *W. P.*, conveyed three-fourths of the north-west township to him, and parcels were sold to settlers. That the rents and profits of the mortgaged premises received, are more than sufficient to satisfy the mortgage; and that the securities taken for the parcels sold, exceed the amount of the mortgage debt; and

the plaintiffs claimed an account of the moneys received, and of the rents and profits, &c., and of all contracts and sales of parts of the premises; and they offered to pay the balance, if any remained due on the mortgage, and prayed to be let into possession of the premises; and that the defendants be required to assign to them the bonds and mortgages, &c. taken on sales of parts of the premises, &c., and for general relief.

The defendant, *Troup*, in his answer, denied any knowledge of any agreement between *W. W.* and *C. W.*, but set forth an agreement made the 4th of *August*, 1795. *C. W.* entered into a covenant with *Charles Hall*, *Daniel P. Faulkner*, *Michael Freeland*, and *William Dunn*, to convey to them, on or before the year 1798, in fee, as tenants in common, the north-west quarter of township No. 6, in the sixth range, in *Ontario* county; on condition, that they should give *C. W.* one dollar and fifty cents an acre; and, to secure the payment, execute a bond and mortgage of the land, payable *June* 19th, 1800, with interest, and give a bond to place twenty-four settlers on the land in two years. By an indorsement on the agreement, it was made a further condition, that no deed should be demanded, until full compensation was made for the mills built on the land, and security, by bond and mortgage, given for the payment, with interest, in four years; and *C. W.* engaged to give them a warrantee deed for the mills. That *Charles Hall*, on the 13th of *October*, 1795, assigned to *William Wilson* all his right in the contract. This defendant admitted the power of attorney given by *W. W.* to *Daniel Faulkner*, who was averred to be the same person named in the agreement, as *Daniel P. Faulkner*. This defendant averred, that *Wilson* had no right to more than about 1325 acres, or to demand a deed for a greater quantity. That on the 21st of *October*, 1796, *F.* and *C. W.* accounted together, with respect to the purchase money, for the said quarter township, and in respect to *Wilson's* rateable share of the cost of the

mills, and of the interest, &c. ; and there was then found due to *C. W.* 1115 pounds ; and, thereupon, *C. W.* executed a deed to *Wilson*, for the one-fourth of the quarter township, excepting the said 700 acres, for the consideration of 798 pounds, as stated in the bill, which deed included the mill lots ; and that, on the same day, *Faulkner*, as attorney of *W.*, in his name, executed a mortgage of the same premises to *C. W.*, for securing the payment of 1115 pounds, and which mortgage contained a power of sale, in the usual form. That the 1115 pounds was the true consideration, and ought to have been so expressed in the deed, as well as in the mortgage, but was omitted through carelessness or ignorance. The defendant denied that *F.*, in executing the mortgage, had exceeded his power ; and that the power of sale contained in it, was according to law, and the common usage and practice in such cases ; and had been the uniform practice of the land offices established by the agents to the *Pulteney* estate, on taking mortgages, to secure the purchase moneys for lands sold. That no objection to the form of the mortgage, was ever made by *Wilson*. That *C. W.* assigned the bond and mortgage to Sir *W. P.*, as stated in the bill. The defendant admitted that he took out administration on the estate of Sir *W. P.*, and that his daughter, who was his heiress at law, died intestate, by which the real estate descended to Sir *John L. Johnstone*, as stated in the bill. That *C. W.* ceased to be the agent of the estate in 1801 ; and at that time, and long before, was in the quiet possession of the premises ; and this defendant, on being appointed agent, came into the possession of the premises, and has since remained in the quiet possession of them, until the filing of the bill by the plaintiffs. That *Wilson*, having met with misfortunes, it was agreed, or was understood, as the defendant believed, that *C. W.* should not demand the payment of the money due on the bond and mortgage, and *Wilson* should not claim the mortgaged premises ; and that this belief was

WILSON
v.
TROUP.

confirmed by the fact, that this defendant, on succeeding to the agency of the *Pulteney* estate, received, among the papers, the very deed, stated to have been executed by *C. W.* to *Wilson,* for the premises mortgaged, and which deed the defendant offered to produce. That these circumstances induced the defendant to believe, that the mortgaged premises had been abandoned by *Wilson;* and this defendant, therefore, considered the premises as the absolute property of the *Pulteney* estate, and did not, therefore, scruple to sell various parcels of the land, before any foreclosure of the mortgage ; and that *C. W.* had before caused the premises to be surveyed into lots, and had sold several lots. That the defendant, notwithstanding the circumstances above stated, deeming it more legal and fit, that the equity of redemption should be legally extinguished, caused a letter to be written to *Wilson,* on the 22d of *June,* 1807, by *Samuel S. Haight,* his assistant, requesting *Wilson* to release the equity of redemption ; and he denied that the letter contained any request to *Wilson* to pay the moneys. That *Wilson* declined executing the release, unless he received a compensation ; but did not offer to pay the mortgage money, or pretend that he had a right to redeem. That the mortgaged premises comprise part of *Dansville,* which has become a thickly settled and flourishing village. That to protect the settlers, and prevent prosecution of the equity of redemption to their injury, the defendant, as administrator of Sir *W. P.,* by virtue of the power contained in the mortgage, and pursuant to the statute, on the 16th of *October,* 1810, caused the premises to be advertised for sale, and published once a week, for six successive months, in a newspaper printed at *Canandaigua,* in *Ontario* county, which was nearest to the premises, there being no newspaper published in *Steuben* county. That on the 18th of *October,* 1810, a copy of the advertisement was affixed on the outward door of the court-house of *Steuben* county, where the mortgaged premises were situated, and which

was continued for six successive months. That at the ex-
piration of that period, on the 22d of *April*, 1811, the pre-
mises were sold, pursuant to the advertisement, and pur-
chased by *Samuel S. Haight*, at the request of the defend-
ant, for 350 pounds, *H.* being the highest bidder. That a
deed was, in due form, executed by *John Fellows*, as sub-
stitute for the defendant, to *Haight*, who, afterwards, for
the nominal consideration of one dollar, executed a release
of all his right to the premises, to Sir *John L. Johnstone*,
as stated in the bill ; and he alleged, that the sale was, in
all respects, regular and fair, and made with good faith,
pursuant to the statute ; and he insisted, that it was a bar
to the relief sought by the plaintiffs, &c. &c.

The other defendants having answered, proofs were taken
in the cause, which was brought to a hearing on the 23d of
*November* last.

*R. Sedgwick*, for the plaintiffs. He cited 1 *Ves.* 251.
1 *Powell on Mort.* 13, 14. 60. 247, 248.  2 *Vernon*, 84.
1 *Johns. Rep.* 498.  18 *Johns. Rep.* 301.

*Wells* and *W. Slosson*, for the defendants. They cited
3 *Johns. Rep.* 145.  4 *Dallas*, 419.  *Burr. Rep.* 1077.
15 *Johns. Rep.* 458.  *Doug.* 265. 574.  *Salk.* 96.  1 *Com.
Dig.* 644. tit. *Attorney*, C. 8.

THE CHANCELLOR.  The great and leading point in the
case, is, whether the sale of the mortgaged premises, under
the power contained in the mortgage, was duly made under
a competent power.

If this point be determined in favour of the sale, it will
be unnecessary to examine, whether there was any suffi-
cient ground to consider *Wilson* as having abandoned or
waived, by his acts and acquiescence, prior to the sale,
his equity of redemption in the mortgaged premises, so as
to have excluded himself and his representatives from a
right to redeem.

1823.

WILSON
v.
TROUP.

**1823.**

WILSON
v.
TROUP.

The letter of attorney authorized *Faulkner*, for *Wilson*, and in his name, to ask, demand and receive of *Williamson*, deeds for the premises, and to sign, seal, deliver and acknowledge *a mortgage, or mortgages, &c. and bonds to the amount of the consideration money remaining due, for the better securing the same, according to an agreement thereof, between them made;* and granting to his said attorney full power and authority *to do and perform all things necessary and lawful,* to the obtaining to him, and for his use, a title, &c., and *securing the consideration money therefor to the aforesaid Charles Williamson.*

Under this power, a deed was received by *Faulkner* from *Williamson* to *Wilson*, and a mortgage, simultaneously, and of the same date, (being the 21st of *October*, 1796,) executed by *Faulkner*, for and in the name of *Wilson*, to secure the amount of the consideration, including a reasonable compensation for the mills built upon the premises. This allowance for the mills, which increased the amount of the mortgage beyond the actual consideration in the deed, was in pursuance of an agreement between *Williamson* and *Faulkner*, who acted on behalf of all the partners in interest in the premises, and which agreement was alluded to in the letter of attorney. The mortgage was in the printed form, used in the offices of the agency of the *Pulteney* estate, and it contained the usual power to sell on default of payment, and which power had been invariably inserted in all the mortgages taken by the *Pulteney* agent.

A power to mortgage, includes in it a power to authorize the mortgagee to sell, in default of payment.

A power to mortgage, would seem to include in it a power to authorize the mortgagee to sell, on default of payment; because the power to sell, is one of the customary and lawful remedies given to the mortgagee. It is a power which has been repeatedly regulated by statute, and is, therefore, known to the law, and is in universal use. It has, consequently, become an incident to the power to mortgage, and will, of course, be included in such power, if there be nothing in the instrument conveying

the power specially excluding it; and the party creating the power be competent in age to grant it.

Courts of equity look to the end and design of the parties, in considering the extent of powers, and to a substantial, rather than to a literal execution of the power. On this principle, a power limited in terms, has, in favour of the intention, been deemed a general power; and a general power in terms, has been cut down to a particular purpose. Why should we not conclude, that the parties, in this case, had in contemplation a mortgage in the usual sense of that security, with all the remedies then in use and recognised by law? It is very certain, that the mortgagee meant a mortgage with a power to sell, because it was his invariable practice to take mortgages with such a power; and when he entered into a covenant with *Faulkner* and others, in 1795, to sell the land, and *take a good and sufficient bond and mortgage*, it is to be presumed that the same kind of mortgage was understood between the parties, which was afterwards executed by *F.*, and accepted by *W.*, under the power. It is equally reasonable to presume, that *Wilson*, who created the power, from the proximity of his residence to the *Pulteney* offices, his intimacy with *Faulkner*, his attorney, and the general notoriety of the transactions of the agency of the *Pulteney* lands, must have been acquainted with the practice of the *Pulteney* agents in taking mortgages; and that he also meant a mortgage full and effectual, according to that practice, with all the customary remedies to enforce it. A power to mortgage, is a power to give the same security, under that name, in as full and effectual a manner, as the party himself who created the power could give. The letter of attorney was general in its terms. It was to give "a mortgage," and "to do and perform all things necessary and lawful for securing the consideration money." If the power to sell was usually inserted in a mortgage, as an ordinary and lawful part of it, the attorney, in this case, had authority to insert it un-

*Margin notes:*

1823.

WILSON v. TROOP.

The Court, in considering the extent of powers, looks to the end and design of the parties, and to the substantial rather than the literal execution of them. And in support of such intention, a power, limited in terms, has been deemed a general power; and a general power in terms, has been reduced to a particular purpose.

A letter of attorney, to sign, seal, and deliver a mortgage, &c. to do and perform all things necessary and lawful, for obtaining a title to land, and securing the consideration money therefor, gives an authority to do every thing incident to a mortgage, which the party creating the power could himself do.

der his general authority to mortgage, and to do what was necessary and lawful. Every thing incident to a mortgage which *Wilson* himself could do, in and by the act of giving a mortgage, *F.* could do under the power.

Powers are construed with this liberality, and to this extent.

In *Liefe* v. *Saltingstone,* (1 *Mod.* 189. 1 *Freem.* 149. 163. 176. S. C.) the testator devised his farm to his wife for her natural life, and by her *to be disposed of,* to such of his children as she should think fit. She conveyed the estate to her son, in fee, and the power was held well executed, even at law. The principle of the case was, that, where the *devisor gives to another a power to dispose, he gives to that person the same power that he himself had to dispose.* If the devise be, that *J. S.* may sell my land, he may sell the inheritance.

There is much force to be given to the validity of the power to sell, from a view of the doctrine touching leasing powers. If a tenant for life has power to grant leases " requiring the best improved rent," he may cause to be inserted in the leases the usual covenants as to non-payment of the rent, and a clause of re-entry upon non-payment, though the power be silent as to any covenants of that kind. These incidental provisions are considered as implied in the power of leasing. Such provisions were deemed valid, though the lease was, on other accounts, much criticised, in *Jones* v. *Verney,* (*Willes Rep.* 169.) and the omission of them would be fatal under such a power, according to the opinion of Lord *Mansfield,* in *Taylor* v. *Horde.* (1 *Burr.* 125.) To show the liberal construction of powers in equity, in furtherance of the end for which they were created, we may refer to the case of *Roberts* v. *Dixwell,* (2 *Eq. Cas. Abr.* 768. pl. 19.) in which a power to appoint and divide an estate, was held well executed by a charge of a sum of money upon it; for though that was not within the direct terms of the power, yet Lord *Hardwicke* held it to be

within the intent, and to be an execution of the power in substance. Again, in *Long* v. *Long*, (5 *Ves.* 445.) it was held, that a power to charge an estate with the payment of moneys for the benefit of the children, as he should think fit, would authorize a disposition of the estate itself. A power to charge, included a power to sell; and Sir *William Grant* afterwards (6 *Ves.* 797.) cited the case as establishing that point; and he seems to have sanctioned, in *Bullock* v. *Flagate*, (1 *Ves. and Bea.* 471.) such deviations from the letter of the power. And though it is considered as a questionable point, whether a power to sell or exchange will authorize a partition of land, (*Abell* v. *Heathcote*, 2 *Ves. jun.* 98. 4 *Bro.* 278. S. C. questioned in *Mᶜ Queen* v. *Farquhar*, 11 *Ves.* 467. and *Attorney General* v. *Hamilton*, 1 *Madd. Rep.* 214.) yet Mr. *Sugden*, (*Treat. on Powers*, 2d edit. 446. 449.) gives it as the result of the cases, that, where a freehold interest is authorized to be appointed under a power, a different species of estate, less valuable, will be supported in equity. We surely cannot be departing from the spirit of all these cases, when we construe a power to mortgage, as involving in it a power to add the ordinary and lawful remedies prescribed by law, upon breach of the condition of the mortgage. The remedies are the means for rendering the mortgage an effective security for the debt. The statute foreclosure is cheaper and more simple, and generally more expeditious, than a foreclosure by bill in Chancery; and it is always deemed a matter of some consequence by the mortgagee, that he should have such a remedy within his discretion. At so early a period as the date of the mortgage, when the practice of this Court was quite limited, and in very few hands, the authority to sell by act of the party, must have been deemed of almost incalculable value. That power is still necessary to the completion and perfection of the security, because it affords the alternative remedy authorized by law. A power to mortgage does, therefore, very clearly, in my view of the

1823.

WILSON
v.
TROUP.

1823.

WILSON
v.
TROUP.

case, carry with it the power to authorize the mortgagee to foreclose, by selling under the statute. The power intended a mortgage in the best manner that it could be made, consistently with law; and as between the mortgagee and mortgagor, the equity of the case is, that the former should be deemed clothed with all the customary rights and privileges of a mortgagee; and more especially, when it appears that this same mortgagee was in the invariable habit of taking mortgages in the form adopted in this case.

A different construction would make the mortgage operate most injuriously upon the mortgagee; and in the present instance, by unsettling titles, it would work immense mischief. It may be observed, in aid of the construction I have adopted, that *Wilson* acquiesced during his life time in the execution of the power. He is presumed to have had early notice of the bond and mortgage, and of the terms of them; and not one word of objection to the power was made by him, from *October*, 1796, to his death, in 1814. It is with the appearance of great injustice, that his representatives should, at this day, attempt to set aside the sale upon such a pretext.

If the power be admitted to have been inserted in the mortgage by proper authority, it puts an end to the present claim. The sale was fairly made, upon the due public notice required by law. This is very satisfactorily proved, and there is no ground for the charge of irregularity, touching any part of the proceedings. Something was said upon the argument, about fraud in the sale; but there is no such allegation in the bill, nor is it made a point in the case by the plaintiff's counsel. The charge is irregularity and want of authority; and there is nothing in the proofs to give countenance to the suggestion of fraud, had it even been made a substantive averment in the bill. The power to *Faulkner* to execute the mortgage, is fully proved. It was recorded in 1809, and again in 1812;

and the power contained in the mortgage was duly record-
ed as early as *June*, 1808.

There is not, then, any ground to impeach the title held
under the sale. The mortgaged premises were purchased
by *Samuel S. Haight*, on behalf of the proprietors of the
*Pulteney* estate; and the statute authorized the mortgagee,
or any person on his behalf, to purchase. The title thus
acquired, cannot, to use the words of the statute, " be de-
feated in favour of, or for the benefit of, any person claim-
ing the equity of redemption." The only remaining pre-
tence, upon which the sale is to be defeated, is, that the
defendants had previously conveyed a part of the premises
in fee. These conveyances were made under the assump-
tion that *Wilson* had abandoned all claim to the equity of
redemption, and the deed from *Williamson* to him was in
possession of the *Pulteney* agent. If that deed had been
surrendered by *Wilson*, (and we cannot otherwise account
for its being in possession of the mortgagee,) it affords very
strong colour for the inference, that the right of redemp-
tion had been truly abandoned; and that inference is much
strengthened, by his long acquiescence in the possession
taken and acts exercised by the mortgagee, as owner, and
by the non-payment of any part of the principal and inte-
rest of the consideration, according to contract. But I do
not lay much stress on this assumed fact, of the abandon-
ment of the equity of redemption; and I refer to it only as
evidence of the good faith and sincerity with which acts of
ownership over the property were exercised. On this point,
however, we need not dwell; for the mortgagee, afterwards,
treated the property as covered by a subsisting mortgage,
and the equity of redemption was regularly foreclosed.
The sales by the mortgagee could not, upon any reasona-
ble principle, deprive him of the right of foreclosing the
mortgage; nor could they prejudice the right of the mort-
gagor to redeem. If the mortgage was still subsisting, the
purchasers under the mortgagee took subject to the

*A sale by a mortgagee, does not deprive him of the right of foreclosure, nor affect the right of the mortgagor to redeem.*

1823.        mortgage and the right of redemption. A mortgagee, be-
WILSON      fore foreclosure, cannot even make a lease, so as to bind
   v.       the mortgagor when he comes to redeem. (*Hungerford*
TROUP.      v. *Clay,* 9 *Mod.* 1.) The suggestion that the mortgagee

A mortgagee, could not foreclose, because he had previously sold par-
before foreclo-
sure, can do no cels of the land, is entirely without any foundation in pre-
act to bind the cedent or justice. The sales created, of themselves, no ob-
mortgagor
when he offers stacle to the right of redemption. If the mortgagor was
to redeem.
            entitled to redeem, he could recover the possession as
            against those purchasers, equally as well as he could reco-
            ver it against the mortgagee himself, or his heirs after his
            death. A mortgagee cannot, by fine and non-claim, bar
            the equity of redemption. The fine displaces nothing; it
            is still the same estate. (Lord *Redesdale,* in 1 *Sch.* and
            *Lef.* 380.) The same power that awarded the redemp-
            tion, could award a restitution of possession. The argu-
            ment on the part of the plaintiffs, would go to prove that a
            foreclosure by bill, was equally barred, as a foreclosure by
            advertising under the statute. In both modes, the mortga-
            gor should come in before the sale, and make his defence.
            He is presumed, in law, to have equal notice of the pro-
            ceeding in each case; and a foreclosure and sale, is as
            much a bar in the one case as in the other.

                A good deal was said upon the argument, touching the
            disclosure by Mr. *Haight,* of the confidential correspon-
            dence between him and Mr. *Troup,* during the time that he
            was employed to conduct the foreclosure. As I see nothing
            in that correspondence that applies to any part of the case,
            except the point of abandonment by *Wilson* of the right to
            redeem, (and on which I have not thought it necessary to
            dwell,) the competency of that testimony becomes immate-
            rial. But I ought not, perhaps, to let that question pass,
            since it has been discussed before me, and will, probably,
            be discussed again, if the cause should be carried to the
            Court of Appeals; and a motion was made, during the ar-

gument, to suppress those letters, and the question on their competency was reserved.

Mr. *Haight* was employed by Mr. *Troup* to foreclose the mortgage, and he says, he believes that the business of conducting the foreclosure would not have been confided to himself, if he had not been a lawyer. It was professional business; and in respect to that particular transaction, the parties appear to me to have stood in the relation of attorney and client; and the communications in the letters of Mr. *Troup*, prior to the sale, were, upon every reasonable ground, entitled to the protection of that relation, as confidential communications. The voluntary disclosure of those letters relating to that subject, to the adverse party, I consider as a reprehensible breach of trust, and which the right and privilege of the client require should not be permitted in a Court of justice. The letters related, also, to other business, respecting the general agency of the *Pulteney* estate; but that circumstance does not affect the confidential communications relative to the particular business confided to him as attorney, nor destroy the confidence under which the law considers them as received. I should deem it a dangerous precedent, and one that would impair the good faith that ought to be observed, and which the public good, and those valuable interests which clients must confide to their counsel, require to be observed, to lend the sanction of this Court to the disclosures in question. Those letters are, therefore, inadmissible as evidence in the cause.

My conclusion upon the case is, that the plaintiffs are not entitled to redeem, and that the bill ought to be dismissed.

Bill dismissed, without costs.